**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1435

ANSBERTO FERNANDEZ GONZALEZ; VILMA OLIVARES SALGUERO; CAMELIA GUERRERO ANTONIO; JACINTO PEREZ ACOSTA,

       Plaintiffs – Appellants

   and

MARIA ELENA MALDONADO JUAREZ,

       Plaintiff,

   v.

KENNETH T. CUCCINELLI, Senior Official Performing the Duties of the Director, U.S. Citizenship and Immigration Services; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

       Defendants – Appellees.

------------------------------

ASISTA; TAHIRIH JUSTICE CENTER; FREEDOM NETWORK (USA); COALITION TO ABOLISH SLAVERY & TRAFFICKING; CASA DE ESPERANZA; NATIONAL RESOURCE CENTER ON DOMESTIC VIOLENCE; NATIONAL DOMESTIC VIOLENCE HOTLINE; NATIONAL IMMIGRANT JUSTICE CENTER; IMMIGRATION CENTER FOR WOMEN AND CHILDREN,

       Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Terrence W. Boyle, Chief District Judge. (7:18-cv-00135-BO; 7:18-cv-00136-BO; 4:18-cv-00131-BO; 4:18-cv-00132-BO)

Argued: May 27, 2020                                    Decided: January 14, 2021

———————

Before HARRIS, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

———————

Affirmed in part, vacated in part, and remanded by published opinion. Judge Richardson wrote the opinion, in which Judge Harris and Judge Quattlebaum join.

———————

**ARGUED:** Bradley Bruce Banias, BARNWELL, WHALEY, PATTERSON, AND HELMS, Charleston, South Carolina, for Appellants. Lori B. Warlick, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Robert J. Higdon, Jr., United States Attorney, Joshua B. Royster, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellees. Julie Carpenter, Richard Caldarone, TAHIRIH JUSTICE CENTER, Falls Church, Virginia; Sejal Zota, ASISTA IMMIGRATION ASSISTANCE, Suffield, Connecticut, for Amici Curiae Non-Profit Organizations.

RICHARDSON, Circuit Judge:

This case presents a challenge to agency delay and inaction. Plaintiffs are aliens unlawfully present in the United States who seek U-Visas as victims of serious crimes who cooperated with law enforcement. They allege that the Department of Homeland Security has unlawfully withheld or unreasonably delayed adjudication of their U-Visa petitions and their applications for work authorization pending U-Visa approval. Those claims implicate interests that deserve our respect and protection, where we are so empowered. But we lack the power to review Plaintiffs' work-authorization claims here because the agency is not required to adjudicate Plaintiffs' requests. We may, however, review Plaintiffs' claim that Homeland Security unreasonably delayed adjudicating their U-Visa petitions, and that claim cannot be dismissed at this early stage. We therefore dismiss Plaintiffs' claims relating to their requests for pre-waiting-list work authorization and remand Plaintiffs' claim relating to U-Visa adjudications.

The Immigration and Nationality Act entrusts Homeland Security with discretionary authority to grant "U nonimmigrant status" to eligible unlawful aliens who are victims of serious crime and who cooperate with law enforcement. That status carries with it important benefits, including protections against deportation and work authorization. But Congress capped the number of U-Visas at 10,000 per year—meaning not all *eligible* U-Visa applications can be approved. In response, the agency created a "waiting list" for applicants whose applications have been approved and who would have been granted a U-Visa but for the statutory cap. Once on this waiting list, the alien is provided deferred-action status and may be granted work authorization. But before the

3

application is approved and the alien is placed on the waiting list, the agency provides neither deferred-action status nor work authorization. As a result, there are now three stages in the U-Visa process: (1) application submitted but not yet approved; (2) application approved and alien placed on a waiting list; and (3) U-Visa granted.

About a year after this three-tier regulatory scheme was created, Congress authorized Homeland Security to grant work authorization to aliens who have "pending, bona fide" applications for a U-Visa. 8 U.S.C. § 1184(p)(6). Before this, Homeland Security had relied on its alleged inherent authority to grant work authorizations only to those placed on the waiting list. But despite this new discretionary authority, the agency has not relied on it to expand work authorization beyond those placed on the waiting list. Thus, it has not exercised its discretion to grant work authorizations for aliens who have applied but who have not yet been placed on the waiting list.

Here, Plaintiffs in the first stage—those with pending applications who have not been approved for the waiting list—challenge the agency's delay and inaction. Plaintiffs concede—as they must—that the agency has discretion over whether to grant a U-Visa, to place someone on the waiting list, and to grant work authorization. Rather than challenge the agency's authority over their *benefits*, they focus on the agency's failure to timely *adjudicate* their requests. To that end, they allege that the agency has (1) unlawfully withheld or unreasonably delayed adjudication of their claims for pre-waiting-list work authorization, *see* UJA 9–14 (Cause of Action One, Two, and Three), and (2) unreasonably delayed adjudication of their claims for placement on the U-Visa waiting list, *see* UJA 14–19 (Cause of Action Four). The district court was unconvinced and dismissed these claims,

4

holding that it lacked jurisdiction over most of the claims for pre-waiting-list work authorizations and that, in any event, all the claims failed on the merits. Plaintiffs now appeal that decision.

We hold that the first three causes of action must be dismissed, and the remaining claim remanded. The work-authorization claims fall beyond our jurisdiction. Under the Administrative Procedure Act and All Writs Act, we can only compel faster agency action if the agency is *required* to act. But neither congressional statutes nor agency regulations compel the agency to adjudicate these requested pre-waiting-list work authorizations. Without casting doubt on the importance of agency accountability or of providing relief to the aliens among us, we are bound by the narrow role left for us by Congress. In contrast, we reverse the district court's dismissal of the fourth cause of action and hold that Plaintiffs pleaded sufficient facts at this stage to avoid dismissal of their claim of unreasonable delay in placing them on the waiting list.

## I.    Background

### A.    Statutory and regulatory framework

The Immigration and Nationality Act ("INA") provides the Executive Branch broad authority over the admission of aliens into the United States—as well as the conditions of such admission. *See* Pub. L. No. 82-414, § 101, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. § 1101). Among other duties, the INA charges the Secretary of Homeland Security "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1) (noting exceptions); *see also id.* § 1103(g) (Attorney General's duties and authority). And the

5

Secretary "shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter." 8 U.S.C. § 1103(a)(3). The Secretary has, in turn, delegated much of that authority to the United States Customs and Immigration Service ("USCIS"). *See* 6 U.S.C. § 112(b)(1) (providing that, with some exceptions, the Secretary "may delegate any of the Secretary's functions to any officer, employee, or organizational unit of the Department"); *see also* 8 C.F.R. § 2.1.

One important aspect of that delegated authority is USCIS's responsibility for administering the U-Visa Program. 8 C.F.R. § 214.14(c)(1). The U-Visa classification covers eligible aliens who are victims of serious crime and who cooperate with law enforcement. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1513(a)(2)(B), 114 Stat. 1464, 1533 (2000) (codified at 8 U.S.C. § 1101(a)(15)) ("Victims of Trafficking Act"). Established in 2000, this classification provides a set of immigration protections and privileges (including work authorization) for aliens who are both eligible for and granted U-Visas by the agency. *See* 8 U.S.C. § 1101(a)(15)(U) (providing statutory eligibility criteria); 8 U.S.C. § 1184(p) (providing petitioning procedures, agency duties and authority, and a statutory cap of 10,000 U-Visas per year).

Congress amended this program in the Violence Against Women and Department of Justice Reauthorization Act of 2005 ("Violence Against Women Act"), Pub. L. 109-162, 119 Stat. 2960 (2006). This Act directed the Secretary of Homeland Security to promulgate regulations implementing the statutory U-Visa provisions. *Id.* § 828. To

6

comply with this statutory mandate, USCIS—wielding the Secretary's delegated authority—promulgated regulations to govern the conferral of U-Visas. *See* 72 Fed Reg. 53,036 (Sept. 17, 2007) (codified at 8 C.F.R. § 214.14); *see also* 72 Fed. Reg. 54,813 (Sept. 27, 2007); 74 Fed. Reg. 55,738 (Oct. 28, 2009); 78 Fed. Reg. 18,472 (March 27, 2013); 81 Fed. Reg. 91,670 (Dec. 19, 2016).

These statutory and regulatory provisions—the Victims of Trafficking Act, the Violence Against Women Act, and the USCIS regulations—provide the basic framework for the U-Visa Program as it currently stands. To apply for a U-Visa, an alien must file a petition with USCIS. *See* 8 U.S.C. § 1101(a)(15)(U)(i); 8 C.F.R. § 214.14(c)(1). An alien qualifies if the Secretary of Homeland Security (and USCIS as his designee) determines that the alien: (1) "has suffered substantial physical or mental abuse as a result of having been a victim of criminal activity"; (2) "possesses information concerning [the] criminal activity"; (3) "has been helpful, is being helpful, or is likely to be helpful to [government officials] investigating or prosecuting [the] criminal activity"; and (4) the criminal activity is a covered offense that "violated the laws of the United States or occurred in the United States . . . or the territories and possessions of the United States." 8 U.S.C. §§ 1101(a)(15)(U)(i)(I)–(IV); *see also* § 1101(a)(15)(U)(iii) (listing covered offenses). The petitioning alien must also be generally "admissible" or must obtain a discretionary waiver of inadmissibility from USCIS. *See* 8 U.S.C. § 1182(a); 8 C.F.R. § 214.1(a)(3)(i); 8 C.F.R. § 214.14(c)(2)(iv); *see also* 8 U.S.C. § 1182(d)(3)(A)(ii), (d)(14); 8 C.F.R. § 212.17.

When a petitioning alien has satisfied the statutory criteria (and complied with the requisite procedures), the agency has committed to approve the U-Visa petition and grant a U-Visa (along with the immigration protections and work authorization) subject to the annual statutory cap set by Congress. *See* 8 C.F.R. § 214.14(c)(5)(i).

That statutory cap, however, is critical. Congress limited the number of principal U-Visas to 10,000 per year. 8 U.S.C. § 1184(p)(2)(A); *see id.* § 1184(p)(2)(B). And yet far more than 10,000 aliens seek U-Visas. As a result, there is a significant gap between U-Visa petitions that meet the eligibility criteria and petitions that the agency may grant— meaning that, as the agency has recognized, many petitioners do not receive a U-Visa only because of the statutory cap.

Given this gap, Homeland Security chose to prioritize which eligible petitioners receive the limited visas based on the date of the petitions. To do so, the agency instructed that all petitioners "must be placed on a waiting list" with "[p]riority on the waiting list . . . determined by the date the petition was filed." 8 C.F.R. § 214.14(d)(2) ("the oldest petitions receiving the highest priority," subject to some exceptions). Once approved and placed on the waiting list, a petitioner (and qualifying family members) is granted deferred action. *Id.* And "USCIS, in its discretion, may authorize employment" for those on the waiting list. *Id.* Until the application is approved and the petitioner is placed on the waiting list, the agency has not committed itself to providing deferred action or work authorization.

Around a year after this statutory and regulatory scheme was created, Congress again amended the U-Visa program. In 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act, Pub. L. 110-457, 122 Stat. 5044.

8

Among other things, this Act amended § 1184(p)(6) to specify that the Secretary of Homeland Security "may grant work authorization to any alien who has a pending, bona fide application" for a U-Visa.

Before this amendment, Homeland Security relied on its alleged inherent authority to grant work authorizations to applicants on the waiting list.[1] The addition in § 1184(p)(6) provides express authority to grant work authorizations to applicants who—like Plaintiffs—neither hold a U-Visa nor sit on the waiting list. But its authority is discretionary. And Homeland Security has maintained its regulatory scheme without expanding work authorizations beyond the waiting list.

To summarize the statutory and regulatory scheme, the statutory provisions and implementing regulations yield a three-tiered structure for aliens seeking a U-Visa. *First*, if an alien has not been granted a U-Visa or been placed on the waiting list, then the agency provides neither discretionary nor mandatory immigration status or work authorizations. *Second*, if an alien is eligible for U-Visa status but cannot be awarded a visa because of the statutory cap, that alien must be placed on the waiting list and is then entitled to deferred action and may be granted work authorization. *See* 8 C.F.R. § 214.14(d)(2); *see also* 8

---

[1] Federal law bars the hiring or continued employment of "unauthorized aliens." 8 U.S.C. § 1324a. And an unauthorized alien is defined, in part, as an alien who is not "authorized to be so employed by this chapter or by" the Secretary of Homeland Security. 8 U.S.C. § 1324a(h)(3). The Executive has claimed that these sections give it discretion to grant employment authorization to aliens, including those without lawful immigration status. *See* DOJ, INS, *Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46,092–93 (Dec. 4, 1987) (concluding that statutory language gave the Executive the general authority to grant work authorization even where no specific statutory authorization existed). We need not address whether the agency has this inherent authority.

9

C.F.R. § 274a.12(c)(14). And *third*, if an alien is granted U-Visa status, then the alien is entitled to temporary lawful residency and must be granted work authorization. *See* 8 U.S.C. § 1184(p)(3)(B); *see also* 8 C.F.R. § 214.14(c)(7).

## B. Plaintiffs' claims

Plaintiffs are aliens who have petitioned for U-Visas and who seek, pending the grant of those petitions, to receive pre-waiting-list work authorization. And they also challenge the agency's delay in placing them on the waiting list. Plaintiff Gonzalez submitted a petition for U nonimmigrant status (Form I-918) and an application for employment authorization (Form I-765) in July 2016. Plaintiff Salguero did the same in June 2016. Plaintiff Antonio, on behalf of herself and her husband, Plaintiff Acosta, filed in April 2016. Plaintiff Juarez submitted her petition in June 2015. *See* UJA 48. As of now, USCIS has not yet adjudicated Plaintiffs' U-Visa petitions (Form I-918) or employment authorization applications (Form I-765).

Plaintiffs brought these four causes of action in the district court below:

1. First Cause of Action – Mandamus claim challenging the Agency's refusal to adjudicate or issue pre-waiting-list work authorization under 8 U.S.C. § 1184(p)(6) based on the "check-box" work-authorization requests on the U-status applications (Form I-918).

2. Second Cause of Action – Administrative Procedure Act claim challenging the Agency's refusal to adjudicate or issue pre-waiting-list work authorization under 8 U.S.C. § 1184(p)(6) based on the "check-box" work-authorization requests on the U-status applications (Form I-918).

3. Third Cause of Action – Administrative Procedure Act claim challenging the Agency's unreasonable delay associated with

10

adjudicating or issuing work authorization based on the Form I-765 application.[2]

4. Fourth Cause of Action – Administrative Procedure Act claim challenging the Agency's unreasonable delay associated with making waiting-list decisions for all Appellants under 8 C.F.R. § 274a.13(d)(2).

In response, the agency moved to dismiss Plaintiffs' claims. The agency sought to dismiss Plaintiffs' first two causes of action for lack of jurisdiction under Rule 12(b)(1) based on both 8 U.S.C. § 1252(a)(2)(B)(ii) (INA) and 5 U.S.C. § 701(a)(2) (APA). The agency also sought to dismiss all four causes of action on the merits under Rule 12(b)(6) for failure to state a claim. And the agency moved to seal their two pleadings under 8 U.S.C. § 1367(a)(2).

The district court held for the agency. It dismissed Plaintiffs' first two claims under Rule 12(b)(1), and the remaining claims under Rule 12(b)(6). The district court also granted the agency's sealing motion. Plaintiffs timely appealed, invoking our jurisdiction under 28 U.S.C. § 1331. We review these dismissals under Rule 12(b)(1) and (b)(6) de novo. *See Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768–69 (4th Cir. 1991); *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991).

## II. Analysis

This appeal raises two challenges to the agency's actions. First, Plaintiffs argue that the agency unreasonably delayed or unlawfully withheld adjudication of their applications for work authorization while they were waiting to be placed on the wait list. Second,

---

[2] Plaintiff Juarez makes no claim based on Form I-765, meaning that he is left out of the third cause of action.

Plaintiffs argue that the agency unreasonably delayed adjudicating their petitions for a U-Visa so that they could be placed on the waiting list. The first is beyond our power so we dismiss those claims. The second must be remanded for further proceedings.

## A.      We lack jurisdiction over the work-authorization claims

The Administrative Procedure Act authorizes suit by "[a] person suffering [a] legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "[A]gency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." § 551(13) (emphasis added). The APA provides relief for a failure to act in § 706(1): "The reviewing court shall . . . compel agency action *unlawfully withheld or unreasonably delayed*." (emphasis added); *see also* 28 U.S.C. § 1331 (providing subject-matter jurisdiction over APA claims). The APA also directs that an agency "shall proceed to conclude a matter presented to it" "within a reasonable time." § 555(b).

We ordinarily adopt a presumption of reviewability. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967). But our authority to compel agency action that has been unlawfully withheld or unreasonably delayed has limits. Our authority does not apply when "statutes preclude judicial review." 5 U.S.C. § 701(a)(1); *see also* 8 U.S.C. § 1252(a)(2)(B)(ii). And it also does not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see also Heckler v. Chaney*, 470 U.S. 821, 831–33 (1985).

But the most important limit for our purposes here is inherent in § 706, which is the very provision that Plaintiffs invoke to seek relief. Under § 706, we may only compel "agency action" that has been "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), the Supreme Court explained § 706's inherent limits. It instructed that a § 706 claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64. "Where an agency 'fails to take a discrete agency action that it is required to take,' the APA creates a private cause of action for a party aggrieved by that agency's unreasonable delay to compel such action." *Fed. Energy Regul. Comm'n v. Powhatan Energy Fund, LLC*, 949 F.3d 891, 903 (4th Cir. 2020) (emphasis omitted) (quoting *Norton*, 542 U.S. at 64). But where an agency is *not required* to do something, we cannot compel the agency to act—let alone to act faster. *See Norton*, 542 U.S. at 63 n.1.

Plaintiffs first challenge the agency's withholding or delaying adjudication of their claims for work authorization before being placed on the U-Visa waiting list. Their claims must be dismissed for a lack of jurisdiction, however, because the agency was not *required* to adjudicate their requests for work authorization—meaning that the failure to adjudicate these claims was not unlawful and the delay in adjudicating these claims was not unreasonable.[3]

---

[3] Because the action the agency fails to take must be both "discrete" and "required," we need not decide whether the action is "discrete" since we find that it is not "required." *Norton*, 542 U.S. at 64.

13

### 1. The Agency is not "required" to adjudicate Plaintiffs' work-authorization requests

Plaintiffs argue that we may compel the agency to adjudicate Plaintiffs' claims for work authorization based on its power to grant work authorizations under § 1184(p)(6) of the INA: "The Secretary *may* grant work authorization to any alien who has a pending, bona fide application" for a U-Visa. 8 U.S.C. § 1184(p)(6) (emphasis added).

Plaintiffs acknowledge that the agency's discretion to grant or deny work-authorization requests does not require it to *grant* those authorizations. Instead, they argue that the agency was required to *adjudicate* the work-authorization requests under the discretionary authority provided by § 1184(p)(6). In Plaintiffs' view, the grant of discretionary authority, combined with eligibility standards (*i.e.*, "pending, bona fide application"), required the agency to make a decision. We disagree. The agency is not required to wield its discretionary authority under § 1184(p)(6) to either grant or deny work authorization to Plaintiffs based on the text, structure, and history of the U-Visa program and related provisions of the INA.

To begin, nothing in § 1184(p)(6) requires the agency to do anything. In fact, the statute shows the agency action is discretionary: "Secretary *may* grant work authorization." 8 U.S.C. § 1184(p)(6) (emphasis added). Plaintiffs agree that this makes the ultimate grant of work authorizations discretionary but argue that the agency is required to make a decision on each application in order to exercise that discretion. Other sections of the INA, however, indicate that this discretion over whether to grant benefits means that the agency has discretion over whether to implement this provision at all.

14

A principal feature of immigration law is protecting Executive discretion. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018); *Arizona v. United States*, 567 U.S. 287, 396 (2012); *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999); *Reno v. Am.–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 486–87 (1999). One such provision makes it clear that:

> no court shall have jurisdiction to review . . . (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security.

8 U.S.C. § 1252(a)(2)(B)(ii).[4]

As noted, § 1184(p)(6) specifies that the Secretary has discretion to grant work authorizations. This discretion suggests the same discretion in implementing the provision. In both the INA and the Acts establishing the U-Visa program, Congress has shown that it knows how to require an agency to implement a provision and adjudicate claims, especially within a certain timeframe. Yet Congress did not do so when it granted the Secretary the authority to provide work authorizations.

Consider the U-Visa program itself. When Congress created the U-Visa program in 2000 as part of the Victims of Trafficking Act, it did not require the Secretary to

---

[4] The government argues that § 1252(a)(2)(B)(ii) provides an independent bar to reviewing these claims. In their view, the discretionary term "may" in § 1184(p)(6) read in light of the statutory structure places claims about adjudications for pre-waiting-list work authorizations within the jurisdictional bar of § 1252(a)(2)(B)(ii). *See Poursina v. United States Citizenship & Immigr. Servs.*, 936 F.3d 868, 871 (9th Cir. 2019); *Zhu v. Gonzales*, 411 F.3d 292, 294–96 (D.C. Cir. 2005); *Mousavi v. USCIS*, 828 Fed. Appx. 130 (3d Cir. 2020). While these arguments help reinforce our holding that *Norton* precludes our review here, we need not determine whether § 1252(a)(2)(B)(ii) independently bars our review.

implement it through regulations.  Pub. L. No. 106-386, § 1513(a)(2)(B), 114 Stat. 1464, 1533 (2000) (codified at 8 U.S.C. § 1101(a)(15)(U)).  For years, the agency did not pass regulations implementing the U-Visa program and no U-Visas were issued.[5]  In 2006, as part of the Violence Against Women Act, Congress mandated that the agency promulgate regulations to implement the program:

> Not later than 180 days after the date of enactment of this Act, the Attorney General, the Secretary of Homeland Security, and the Secretary of State *shall promulgate regulations to implement* the provisions contained in the Battered Immigrant Women Protection Act of 2000[], this Act, and the amendments made by this Act.

Pub. L. No. 109-162, § 828, 119 Stat. 2960, 3066 (2006) (codified as amended at 8 U.S.C. § 1101 note (2006)) (emphasis added).  In response, USCIS promulgated regulations to govern the conferral of U-Visas in 2007 and the first U-Visa was issued in 2008.  *See* 72 Fed Reg. 53,036 (Sept. 17, 2007) (codified at 8 C.F.R. § 214.14); *see also* 72 Fed. Reg. 54,813 (Sept. 27, 2007); *supra* n.5.  But no part of the 2008 Trafficking Victims Protection Reauthorization Act—which added the permissive work-authorization provision in § 1184(p)(6)—requires the Secretary to implement that provision or adjudicate each work-authorization petition.  Pub. L. No. 110-457, 122 Stat. 5044.  Congress explicitly required the Secretary to implement the U-Visa program but remained silent about implementing

---

[5] *See* USCIS, *USCIS Approves 10,000 U Visas for 5th Straight Fiscal Year* (Dec. 11, 2013) (noting that the USCIS approved the statutory maximum of 10,000 petitions for U-visas in the first five years after it began issuing U-visas in 2008); Sejal Zota, *Law Enforcement's Role in U Visa Certification*, Immigration Law Bulletin 2, UNC School of Government (June 2009) (saved as ECF opinion attachment) (noting that the first regulations were passed in 2007 and the first U-Visa was issued in 2008); Anna Gorman, *Victims' U-visa Program Falters*, L.A. Times, (Jan. 26, 2009) (saved as ECF opinion attachment).

16

work-authorization adjudications. This confirms that implementing the latter is not required.[6] Indeed, even Plaintiffs do not argue that § 1184(p)(6) requires the agency to promulgate regulations like the implementation mandate in the Violence Against Women Act did for other parts of the U-Visa program.

Other sections of the Victims of Trafficking Act and Violence Against Women Act also contain provisions requiring implementation, and requiring that the implementation occur within a certain timeframe.[7] Further, while the Trafficking Victims Protection

---

[6] If the 2006 implementation directive referred to the U-Visa program generally or specifically to § 1184(p)(6), then the agency would be required to implement the discretionary grant of authority in § 1184(p)(6). But the implementation directive refers specifically to the Battered Immigrant Women Protection Act and the Violence Against Women Act. It does not apply to future amendments, like the Trafficking Victims Protection Reauthorization Act which amended § 1184(p)(6). Without a similar mandate, implementation of the new provision is discretionary.

[7] The Victims of Trafficking Act, which first created the U-Visa program, contains provisions that show Congress knows how to require an agency to implement a provision. Pub. L. No. 106–386. Many of these sections explicitly require the agency to implement the provision by promulgating regulations within a certain timeframe. *See* § 2702 ("Not later than 90 days after the date of the enactment of this part, the Attorney General shall promulgate guidelines to implement this section (including the information that must be included and the requirements that the States, units of local government, and Indian tribes must meet) in submitting the applications required under this section."); § 107 ("TRAFFICKING VICTIM REGULATIONS.—Not later than 180 days after the date of the enactment of this Act, the Attorney General and the Secretary of State shall promulgate regulations for law enforcement personnel, immigration officials, and Department of State officials to implement the following."); § 2003 ("Not later than 90 days after the date of the enactment of this Act, the Director shall establish guidelines under section 1407(a) of the Victims of Crime Act of 1984 (42 U.S.C. 10604(a)) to specify the categories of organizations and agencies to which the Director may make grants under this subsection."). The Victims of Trafficking Act also includes provisions that require agencies to carry out specific tasks on specific timelines, such as creating issue reports. *See, e.g.*, § 3 ("The Attorney General shall carry out the study to determine the impact of this section and shall submit the results of such study not later than 180 days after the enactment of this Act.").

Reauthorization Act required the Secretary to adjudicate a different set of visas within 180 days, it set no requirements for U-Visa adjudications. *See* 8 U.S.C. § 1101(a)(27)(J); Trafficking Victims Protection Reauthorization Act, Pub. L. No. 110-457, 122 Stat. 5044; *Calderon-Ramirez v. McCament*, 877 F.3d 272, 276 (7th Cir. 2017) (finding no timeline for U-Visa adjudications generally). These textual and structural arguments confirm that the Secretary has discretion in granting a particular work authorization and in adjudicating requests for work authorizations generally.

The discretion afforded to the agency over how to address work-authorization requests means that consideration of every work-authorization request is not "required" under *Norton*. In *Norton*, the agency was mandated by statute to "'continue to manage [wilderness study areas] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness,'" and the agency's own policies required it to manage the wilderness to prevent degradation. 542 U.S. at 65–66. The statute and regulations also required the agency to manage the wilderness study areas "in accordance with land use plans" promulgated by the agency. *Id*. at 69 (internal quotation marks omitted). Plaintiffs argued that these mandatory statute and regulations required the agency to abide by their land plans and that a court could compel agency action in accordance with such plans. *Id*. at 66–67. The Supreme Court rejected this argument and concluded that while Congress

The Violence Against Women Act also requires certain agencies to enact provisions within a certain time, just as it did for the U-Visa program. *See* Pub. L. No. 109–162, § 304 ("Within 90 days after the date of enactment of this Act, the Attorney General shall issue and make available minimum standards of training relating to domestic violence, dating violence, sexual assault, and stalking on campus, for all campus security personnel and personnel serving on campus disciplinary or judicial boards.").

18

had mandated the goals for the agency, the agency retained great discretion over how those goals were to be achieved and the land use plans were "projections" of future actions that could not bind the agency unless they were clearly a commitment to action. *Id.* at 69. The Court reasoned that "[q]uite unlike a specific statutory command requiring an agency to promulgate regulations by a certain date, a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them." *Id.* at 71. The land use plans, therefore, did not require the agency to do anything, so the Court could not review the agency's failure to act in compliance with them because there was no "agency action." *Id.* at 72; *see also Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 195–96 (4th Cir. 2013). Moreover, the Court held that "allowing general enforcement of plan terms would lead to pervasive interference with [the agency's] own ordering of priorities." *Norton*, 542 U.S. at 72.

Despite the presence of statutes and regulations mandating agency action and a land use plan discussing future actions, the Court in *Norton* found that the agency retained broad discretion to act. It explained that "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id.* at 65. Here, § 1184(p)(6) mandates nothing—unlike the statutes and regulations in *Norton*— and there are no policies or regulations to direct the agency's action. And as discussed above, there is no timeline or mandate to act, adjudicate, or implement the provision. So we cannot even "compel the agency to act" without "specify[ing] what the action must be." *Id.*

19

This limitation on our review protects "agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 66. And intervention here "would lead to pervasive interference with [the agency's] own ordering of priorities" because it would force the agency to redirect resources to pre-waiting-list work authorizations. *Id.* at 71. As the agency is not required to adjudicate pre-waiting-list work authorizations, no agency action exists to compel. So under *Norton*, Plaintiffs' first three causes of action are unreviewable.[8]

Despite *Norton*'s application here, Plaintiffs point to broad language from *I.N.S. v. St. Cyr*, 533 U.S. 289, 307–08 (2001) to argue that while a "favorable exercise of discretion" may be unreviewable, that is distinct from "eligibility for discretionary relief." When eligibility is "governed by specific statutory standards," there is "a right to a ruling on an applicant's eligibility," even though relief is "a matter of grace." *Id.* (quoting *Jay v. Boyd*, 351 U.S. 345, 353–354 (1956)). But this line of cases is inapplicable here. First, *St.*

---

[8] Even if the agency were required to implement § 1184(p)(6), it does not follow that it must adjudicate Plaintiffs' work-authorization requests. This is because the agency may have already acted in this realm by permitting discretionary work authorizations for applicants on the waiting list. 8 C.F.R. § 214.14(d)(2). As a result, it is within the discretion of the agency to exercise all of their delegated authority under § 1184(p)(6) or merely adjudicate work authorizations for those on the waiting list. The agency can use categorical rules to exclude certain applications that are a subset of "pending, bona fide" applications without individual adjudications. *See Lopez v. Davis*, 531 U.S. 230, 243–44 (2001). The agency has set a rule that it will only give work authorizations to those on the waiting list, a subset of "pending, bona fide" applications, thus they do not have to adjudicate applications that do not meet this categorical requirement. We cannot compel the agency to exercise the full extent of its authority under § 1184(p)(6) and adjudicate every possible application for work authorizations.

*Cyr* discussed habeas corpus jurisdiction for immigration proceedings and is best limited to those issues. *Id.* at 293. The section of the case Plaintiffs cite focuses on the uniqueness of habeas in requiring Congress to include a clear statement stripping courts of jurisdiction. *Id.* at 300. When Congress does so, they act at the outer limits of their power and raise serious constitutional questions not present here. *Id.* The Court also considered the history of habeas and, especially, the exercise of jurisdiction over legal questions in habeas at the Founding. *Id.* at 305. Because there was no alternative forum and no clear statement stripping the courts of jurisdiction and because of the serious constitutional questions this raised, the Court found that it had jurisdiction over the pure questions of law presented in the habeas petition. *Id.* at 314. Adjudications of the pre-waiting-list work authorizations here, on the other hand, are of recent vintage and do not reach the outer limits of Congress's powers, nor does denying adjudication of this new benefit raise serious constitutional questions. The special writ of habeas corpus is not implicated. Thus, neither the requirement of an especially clear statement to strip us of jurisdiction nor the need to rule on the applicant's eligibility for relief are required.

Second, in *St. Cyr* the agency did not adjudicate a particular benefit request even though procedures and standards for evaluating such requests existed and had historically been employed. *Id.* at 301–09; *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265–66 (1954) (finding that the agency must exercise its judgment in a habeas case because the agency committed itself by regulation). Here, there are no regulations or defined procedures, much less longstanding ones, for evaluating pre-waiting-list work

21

authorizations. And Congress did not mandate implementation of § 1184(p)(6), much less mandate adjudication of the benefits it contemplates.

Plaintiffs argue that the "pending, bona fide" language in § 1184(p)(6) sets a "specific statutory standard" requiring adjudication. *Jay*, 351 U.S. at 353–54. But several circuits, including our own, have rejected that such broad 'standards' render decisions reviewable. For example, the D.C. and Third Circuits rejected the argument that "national interest" provided a judicially manageable standard. *Zhu*, 411 F.3d at 294–96; *Mousavi*, 828 Fed. Appx. at 132–33. The Fourth Circuit came to a similar conclusion in holding that the standard "good and sufficient cause" did not remove discretion. *Polfliet v. Cuccinelli*, 955 F.3d 377, 382–83 (4th Cir. 2020). Here, the term "pending, bona fide application" does not transform the discretionary "may" into a mandatory "shall." The decision to adjudicate remains discretionary. The term "pending, bona fide application" merely sets forth a prerequisite that the agency must satisfy if it chooses, in its discretion, to conduct an adjudication. For even if the agency finds an applicant meets the "pending, bona fide" standard, the agency may still deny her a work authorization. Nothing about the 'standard' guides its discretion in making that decision.

In response, Plaintiffs ask why Congress would pass a provision if it did not intend the agency to implement it. The answer is simple. Without a grant of authority from Congress, the agency has no power. In enacting the provision, Congress authorized, but did not require, the agency to grant work authorizations. Just as Congress does not have to exercise the powers delegated to it by the people, neither does the agency have to exercise its delegated powers where the text and structure of the relevant statute provide it

22

with complete discretion. And the principle that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations," *Aguirre-Aguirre*, 526 U.S. at 425 (internal quotation marks omitted), applies with particular force here, when Congress has conveyed that the agency has broad discretion over the granting of a benefit.

In conclusion, under *Norton* the agency is not required to implement or adjudicate pre-waiting-list work authorizations and so its failure to adjudicate Plaintiffs' requests in a timely manner is unreviewable.

### 2. The agency's former regulation does not commit the Agency to adjudicate Plaintiffs' work-authorization requests

Plaintiffs also argue that a former regulation, 8 C.F.R. § 274a.13(d), committed the agency to adjudicate their work-authorization requests made on the agency's form. That regulation, repealed after Plaintiffs submitted their form requests and before this lawsuit commenced, provided a time-limit for adjudications:

> (d) Interim employment authorization. USCIS will adjudicate the application within 90 days from the date of receipt of the application except as described in 8 CFR 214.2(h)(9)(iv), and except in the case of an initial application for employment authorization under 8 CFR 274a.12(c)(8), which is governed by paragraph (a)(2) of this section, and 8 CFR 274a.12(c)(9) in so far as it is governed by 8 CFR 245.13(j) and 245.15(n). Failure to complete the adjudication within 90 days will result in the grant of an employment authorization document for a period not to exceed 240 days.

8 C.F.R. § 274a.13(d) (effective until Jan. 17, 2017).

In Plaintiffs' view, this regulation required the agency to adjudicate their applications within 90 days of receipt or grant interim employment authorization for a period not to exceed 240 days. In response, the agency argues that this now-repealed regulation does not require it to adjudicate Plaintiffs' pre-waiting-list work authorizations now for two reasons. First, the regulation in § 274a.13(d) did not compel the agency to review these types of claims even when it remained effective. And second, it has since been repealed and no longer imposes any adjudicatory obligation on the agency. The agency is correct on both points. The forms and regulation do not commit the agency to adjudicating Plaintiffs' work-authorization requests.

First, the 90-day regulation existed before § 1184(p)(6) and applied only after an applicant was placed on the waiting list. As the agency has not implemented § 1184(p)(6), we cannot read the regulation as committing the agency to adjudicate pre-waiting-list work authorizations through that regulation. Before § 1184(p)(6), the regulation permitted work authorizations once placed on the waiting list based on an adjudication occurring within 90 days. As an applicant could not get work authorization until they were on the waiting list, the 90-day period could not be triggered by the initial application. Since 2014 when the agency began accepting forms for U-Visa and work authorization at the same time, it has made clear that the 90-day adjudication period does not begin until the petitioner becomes eligible to work after being placed on the waiting list. *See* USCIS, "Instructions for Petition for U Nonimmigrant Status and Supplement A, Petition for Qualifying Family Member of U-1 Recipient," (saved as ECF opinion attachment); *Auer v. Robbins*, 519 U.S. 452, 463 (1997). Because the agency treats placement on the waiting list as a threshold requirement

24

for receiving work authorization, the application for work authorization is not completed until waiting-list placement has been approved. Even though an applicant asks for work authorization when they apply for a U-Visa, they do not yet qualify for work authorization and thus do not meet the requirements for a complete application.

Plaintiffs contend that the regulation does not except § 1184(p)(6) but it did except other visas, so it must apply to § 1184(p)(6). And because it must apply to § 1184(p)(6), it commits the agency to adjudicating the work-authorization requests that the provision contemplates. First, the regulation (§ 274a.13(d)) preexisted § 1184(p)(6), so we should not read too much into its failure to except the statute. Second, Plaintiff's argument presupposes that the agency must implement § 1184(p)(6), which they do not. This regulation does not mandate adjudicating any request under § 1184(p)(6). It only provided the procedures that were to be followed where the agency decided to adjudicate them. There was no need to except § 1184(p)(6) because it has not been, and without the regulation need not be, implemented. The regulation, by itself, cannot commit the agency to implement a new provision.

Even if the regulation could commit the agency, it was repealed before this case began, and we can apply that repeal to cases that arose before it, like this one, because such an application is considered "non-retroactive." In determining whether a statute or regulation applies retroactively, we first consider whether the law specifies that it is retroactive. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 257 (1994). Because the repeal of this regulation says nothing as to its retroactive effect, we ask whether application of the new rule would have a retroactive effect. *Id*. at 280. "A statute does not operate

'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment." *Id*. at 269. "The inquiry into whether a statute [or regulation] operates retroactively demands a commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment." *St. Cyr*, 533 U.S. at 321 (internal quotation marks omitted). A regulation has retroactive effect "when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Id*. A court's determination of retroactivity should be guided by considerations of "fair notice, reasonable reliance, and settled expectations." *Id*. Changes in procedural rules, such as the right to a jury and the lifting of sovereign immunity, tend not to have a retroactive effect while changes to substantive rules, such as a new right to damages, do. *See Landgraf*, 511 U.S. at 272–81; *see also Republic of Austria v. Altmann*, 541 U.S. 677, 692–700 (2004).

Decisions from various courts, including this one, illustrate this point. In *St. Cyr*, the Supreme Court found that the repeal of INA § 212(c), which gave the Attorney General discretion to waive deportation of resident aliens, was impermissibly retroactive because it eliminated any possible relief under § 212(c) for individuals who entered a "quid pro quo" plea deal based on the availability of that relief. *Id*. at 321–23. The potential of obtaining this relief was one of the "principal benefits" that those who waived their constitutional rights sought in entering a plea deal, so repealing any chance at that relief "attache[d] a new disability" to the petitioners. *Id*. That the relief was discretionary did not change the conclusion, because the Court saw a difference "between facing possible deportation and

26

facing certain deportation." *Id*. at 325. The next year in *Chambers v. Reno*, 307 F.3d 284, 289–91 (4th Cir. 2002), we rejected a claim that the repeal of § 212(c) was impermissibly retroactive as applied to immigrants who chose to go to trial rather than accept a plea agreement. We distinguished *St. Cyr* because unlike a plea deal made in reliance on the relief, "it is not likely that aliens who go to trial to challenge the underlying crime do so primarily because they hope to obtain discretionary relief." *Id*.

If the plaintiff did not rely on the pre-existing state of the law to their detriment, then a regulation may apply retroactively, even if it is unfavorable to the plaintiff. Several circuits have distinguished the result of *St. Cyr* from the retroactivity analysis of a regulation promulgated by the Attorney General that increased the standard for certain immigrants to receive an adjustment of status under INA § 212(h). *See Samuels v. Chertoff*, 550 F.3d 252, 261 (2d Cir. 2008); *Mejia v. Gonzales*, 499 F.3d 991, 997–98 (9th Cir. 2007). The Ninth Circuit rejected the argument that the increased standard for relief imposed a "new disability" because unlike in *St. Cyr*, the plaintiff was still able to seek discretionary relief and it was unlikely that he had relied on applying the lower standard when he pleaded guilty to a removable offense. *Mejia*, 499 F.3d at 997–98. Likewise, looking to notice and reliance interests, several circuits—including ours—have also found that the elimination of the § 212(i) discretionary waiver for parents of United States citizens was not impermissibly retroactive, distinguishing *St. Cyr* "because an alien could not reasonably rely on the existence of a discretionary waiver to commit illegal conduct." *Patel v. Gonzales*, 432 F.3d 685, 690 (6th Cir. 2005); *see also Cervantes–Gonzales v. INS*, 244 F.3d 1001, 1006 (9th Cir. 2001); *Okpa v. INS*, 266 F.3d 313, 318–19 (4th Cir. 2001).

In a different context, the Sixth Circuit found that repealing obesity as a disability for attaining social security benefits was not impermissibly retroactive even though it was detrimental to the plaintiff. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 645–47 (6th Cir. 2006). The court concluded that the plaintiff did not "become obese or otherwise become impaired in reliance" on obesity being listed as a disability. *Id.* at 646. He also did not file his claim based on an assumption that the listing would be used to adjudicate it nor did he have a settled expectation that the agency would use this "algorithm," rather than another, to determine whether the statutory requirements were satisfied. *Id.* There was also "no basis for the claimants to argue that they need 'fair notice' of a change" in the list. *Id.* The court also determined that the change was procedural rather than substantive even though it could be "outcome-determinative," because only a presumption "designed for administrative workability," rather than the criteria for establishing a disability, changed. *Id.* at 647. If eliminating an outcome-determinative presumption is procedural, then so is the 90-day adjudication rule here. Such a rule is even more procedural than a presumption, as it merely affects timing, not the substance, of an adjudication.

Based on this case law, we determine that the repeal of 8 C.F.R. § 274a.13(d) (2016) is not impermissibly retroactive as applied to Plaintiffs in this case. Unlike in *St. Cyr*, Plaintiffs here gave up no rights to their detriment in reliance on a 90-day adjudication. Whether they ultimately obtain the relief desired is not impacted by the repeal of this regulation; what is impacted is how long they will wait for that determination. Nor did Plaintiffs apply for work authorizations because of the 90-day timeline. There is thus no notice, reliance, changes in legal obligations, duties, impaired rights, or settled expectations

28

concerns that would caution against applying the repeal to this case. *St. Cyr*, 533 U.S. at 321. So because the repeal of 8 C.F.R. § 274a.13(d) properly applies to past conduct without impermissible retroactive effect, the 90-day adjudication regulation does not apply to Plaintiffs. As a result, Plaintiffs cannot claim that the agency committed itself to adjudicate their work-authorization requests based on that regulation.

\*   \*   \*

Plaintiffs' cannot prevail on their claims that the agency has unlawfully withheld or unreasonably delayed adjudication of their requests for pre-waiting-list work authorizations. The agency was not required—whether by statute, regulation, or anything else—to adjudicate these claims in the first place. So it is beyond our power to force the agency to act (let alone to act faster) under either the APA or the All Writs Act.[9] That means that Causes of Action One, Two, and Three must be dismissed, leaving us with only Cause of Action Four.

**B.     The claim for unreasonable delay in adjudicating Plaintiffs' petitions for placement on the waiting list must be remanded**

Count Four raises the second challenge Plaintiffs bring: the agency has "unreasonably delayed" adjudicating Plaintiffs' petition for a U-Visa to determine whether

---

[9] The All Writs Act codified "[t]he common-law writ of mandamus." *South Carolina v. United States*, 907 F.3d 742, 754 (4th Cir. 2018). To succeed on a petition for a writ of mandamus, the petitioner must show, among other things, that "the respondent had a clear duty to do the particular act requested by the petitioner." *In re First Fed. Sav. & Loan Ass'n of Durham*, 860 F.2d 135, 138 (4th Cir. 1988). As discussed for the APA, the agency has unreviewable discretion in their decision not to adjudicate Plaintiff's claim and thus cannot have a "clear duty to . . . act." *Id.* We therefore need not discuss the other factors relevant to deciding a petition for a writ of mandamus.

they should be placed on the waiting list.[10] The district court dismissed this challenge for failure to state a claim. While the district court's analysis may eventually prevail, it must do so, if at all, at a later stage. As it stands, Plaintiffs have pled sufficient facts to allege a plausible claim. So we vacate the dismissal of this claim and remand for further proceedings.

The Supreme Court has not, so far, provided clear guidance on how to determine how long is too long to wait for an agency adjudication. But most lower courts have followed the D.C. Circuit's decision in *TRAC v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984), which "list[s] factors that are relevant to determining whether agency action has been unreasonably delayed." *Fed. Regulatory Comm'n v. Powhatan Energy Fund, LLC*, 949 F.3d 891, 903 (4th Cir. 2020). The six *TRAC* factors are:

(1) the time agencies take to make decisions must be governed by a rule of reason;
(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
(5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

---

[10] These claims are reviewable. Unlike the requested work authorizations, Congress mandated that the agency pass implementing regulations for the U-Visa program, which it did. 8 U.S.C. § 1101(a)(15)(U); § 828 ("RULEMAKING: Not later than 180 days after the date of enactment of this Act."); *see, e.g.*, 72 Fed Reg. 53,036 (Sept. 17, 2007) (codified at 8 C.F.R. § 214.14). Similarly, unlike the pre-waiting-list work authorizations, the agency has committed itself by regulation to place eligible applicants on the waiting list. 8 C.F.R. § 214.14(d)(2) ("[a]ll eligible petitioners who, due solely to the cap, are not granted U–1 nonimmigrant status *must* be placed on a waiting list" (emphasis added)).

(6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (internal citations omitted); *see also Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003).  The district court is not limited to these factors and is not required to use them.  But the *TRAC* factors offer helpful guidance in this inquiry, even if they do not define the entire field.  On this record, however, we lack sufficient information to resolve this issue on a motion to dismiss.  A claim of unreasonable delay is necessarily fact dependent and thus sits uncomfortably at the motion to dismiss stage and should not typically be resolved at that stage.

Although the district court's position may ultimately be vindicated, at this point Plaintiffs have done enough.  While a 'first in, first out' approach with enumerated exceptions may be a rule of reason, we do not know enough about how the agency implements its rules and exceptions.  We also think that Plaintiffs have pled sufficient facts to show that their interests are weighty, implicate health and welfare, and are harmed by the long wait.  The agency may be able to refute these contentions, but at this stage we may review only Plaintiffs' pleadings.

Among the issues that may be important on remand are resource constraints.  The agency may well be able to show resource constraints and competing priorities in any number of ways.  And courts generally "have no basis for reordering agency priorities." *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991); *see also Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 280 (4th Cir. 2004) (noting that when an agency faces "a backlog of tens of thousands of cases," it "operates in an environment of limited resources, and how

it allocates those resources to address the burden of increasing claims is a calculation that courts should be loathe to second guess"). But at this point we cannot rely on the agency's allegations to find as a matter of law that this factor necessarily favors the agency.

Given the nature of this inquiry, we must vacate the dismissal of this claim and remand for further proceedings—perhaps including limited discovery—on the fourth cause of action.

## C.    The sealing order is remanded

The final issue we must address is the district court's order granting the agency's motion to seal their two pleadings. To seal a document, the district court must (1) give the public adequate notice of a request to seal and a reasonable opportunity to challenge it, (2) consider less drastic alternatives to sealing, and (3) if it decides to seal, state the reasons, supported by specific findings, behind its decision and the reasons for rejecting alternatives to sealing. *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984). The district court here gave adequate notice of and opportunity to challenge the sealing request by filing the motions publicly and allowing competing briefing on the issue. It did not, however, satisfy the other two procedural requirements.

The district court also did not adequately explain whether 8 U.S.C. § 1367(a)(2)[11] repealed the common-law rule for sealing documents. If it did not, the district court should

---

[11] That provision states:

Except as provided in subsection (b), in no case may the Attorney General, or any other official or employee of the Department of Justice, the Secretary of Homeland Security, the Secretary of State, or any other official or employee of the Department of Homeland Security or Department of State

have engaged in a common-law analysis. At common law, a district judge must weigh the competing interests of the public's access to judicial proceedings and the interests of the individuals in keeping the information private and of the government in ensuring integrity in its processes. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597–98 (1978); *see also United States v. Harris*, 890 F.3d 480, 491–92 (4th Cir. 2018) (declining to seal decision). In making this sealing determination, we have suggested that the factors to be considered "include whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records." *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984); *Nixon*, 435 U.S. at 597–608.

Finally, the district court did not grapple with the public's First Amendment interest in access to judicial proceedings. A sealing involving "judicial records and documents" can be accomplished "without violating First Amendment rights only if (1) closure serves a compelling interest; (2) there is a 'substantial probability' that, in the absence of closure, that compelling interest would be harmed; and (3) there are no alternatives to closure that

---

(including any bureau or agency of either of such Departments) . . . permit use by or disclosure to anyone (other than a sworn officer or employee of the Department, or bureau or agency thereof, for legitimate Department, bureau, or agency purposes) of any information which relates to an alien who is the beneficiary of an application for relief under paragraph (15)(T), (15)(U), or (51) of section 101(a) of the Immigration and Nationality Act or section 240A(b)(2) of such Act.

8 U.S.C. § 1367(a)(2)

33

would adequately protect that compelling interest." *In re Washington Post Co.*, 807 F.2d 383, 390, 392 (4th Cir. 1986) (quoting *Press-Enter. Co. v. Superior Court of California for Riverside Cty.*, 478 U.S. 1, 14 (1986)); *see also In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 290 (4th Cir. 2013); *see also In re Knight Publ'g Co.*, 743 F.2d at 235. The district court should have considered these factors.

As a result, we remand the sealing order so that the district court may weigh alternatives to sealing, more fully explain its decision, and engage in a common-law and First Amendment analysis in the first instance.

*        *        *

No one doubts the importance of the statutory and regulatory benefits Plaintiffs seek. And no one doubts that, where Congress has entitled aliens to the protection and benefit of our laws, the Executive Branch must take care to faithfully execute the Legislative Branch's instructions. But our role here is modest. We are a court of the Judicial Branch—limited, bounded, restrained. Our power is not coterminous with subjective notions of justice. Instead, it is limited by the positive boundaries set by Congress and our Constitution. Those boundaries are all the more important when, as here, we are asked to tread into an area that is appropriately dominated by the people's elected representatives rather than their life-tenured judicial servants. Because of our limited role, we simply cannot provide all of the relief that Plaintiffs seek. Plaintiffs' claims that the agency has unreasonably delayed or unlawfully withheld adjudication of their requests for pre-waiting-list work authorizations are beyond our power. Plaintiffs' claim of

34

unreasonable delay related to waiting-list adjudications, however, does survive at this

stage.  As a result, we remand for further proceedings.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*